UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>TIMOTHY GRAVENS,<br><br>    Defendant. | CR. 13-50101-JLV<br><br><br>ORDER |

### INTRODUCTION

Defendant Timothy Gravens, appearing *pro se*, filed a motion for compassionate release.  (Docket 104).   Pursuant to the May 1, 2020, Standing Order 20-06, the Federal Public Defender for the Districts of South Dakota and North Dakota ("FPD") and the United States Attorney for the District of South Dakota filed records, submissions and briefing on Mr. Gravens' motion. (Dockets 106-108 & 113).   For the reasons stated below, defendant's motion is granted.

### STANDING ORDER 20-06

Standing Order 20-06,[1]  captioned "Establishing a Procedure for Compassionate Release Motions Under the First Step Act," intends "to establish a procedure for submission and consideration of compassionate release

---

[1] See https://www.sdd.uscourts.gov/so2006 ("SO 20-06").

motions under the First Step Act, 18 U.S.C. § 3582(d)(l)(A), in the wake of the spread of the COVID-19 virus into the federal prison system."   (SO 20-06 at p. 1).   Under the order, the FPD is automatically "appointed to represent all defendants in criminal cases: (a) who previously were determined to be entitled to appointment of counsel or who are now indigent; and (b) who may be eligible to seek compassionate release under the First Step Act."   Id. ¶ 1.   The initial step for the FPD is to

> communicate a recommendation to inmates interested in compassionate release that they immediately submit requests for compassionate release to the warden of the facility in which they are detained, if they have not done so already.   These communications will include the recommendation that the prisoner describe their proposed release plan.

Id. ¶ 2.

By the standing order, "within two business days of filing all motions for compassionate release[,]" the FPD and the United States Attorney for the District of South Dakota are "to place [the defendant] into one of four categories[.]"   Id. at p. 2 ¶ 4.   Those categories are:

> a.   High Priority Cases where there exists some combination of: (i) medical issues that correspond to the categories outlined in the commentary to U.S.S.G. § l.B.1.13; (ii) recognized COVID-19 risk factors in the inmate's medical history; and/or (iii) imprisonment in a federal facility known to have a serious COVID-19 outbreak in its population. . . .
>
> b.   Intermediate Priority Cases where identified medical issues and/or COVID-19 risk factors and/or institutional concerns are less extreme than High Priority Cases.
>
> c.   Low Priority Cases where there are no identifiable medical issues or COVID-19 risk factors.

2

      d.     Unknown Risk Cases where there is a lack of sufficient information to categorize the request for compassionate release.

Id.   Once placement is assigned, the FPD and U.S. Attorney are to "immediately report the categorization . . . to the Clerk of Court and the Probation Office."   Id.   The standing order contains provisions for sharing of critical information between the FPD, the U.S. Attorney, the Probation Office and the court.   Id. ¶ 5.   The priority of briefing is set according to the different categories of assignment of a defendant.[2]   Id. ¶¶ 6-8.

## FACTUAL BACKGROUND

On September 24, 2014, defendant Timothy Gravens was sentenced to a term of imprisonment of 180 months for commercial sex trafficking in violation of 18 U.S.C. §§ 1591(a)(1), 1591(b)(1), 1594(a) and 1594(d)(1).   (Docket 82). This sentence was the statutory minimum term of imprisonment mandated by 18 U.S.C. § 1591(b)(1).   But for this mandatory minimum sentence, according to Mr. Gravens' presentence report ("PSR"), "[b]ased on a total offense level of 33 and a criminal history category of I, the guideline imprisonment range [would have been] 135 months to 168 months."[3]   (PSR ¶ 58).

---

[2]SO 20-06 was amended on October 21, 2020, after this case was ripe for resolution.   See https://www.sdd.uscourts.gov/socraa.   The amendments have no impact on the court's analysis of this case.

[3]At the time of Mr. Gravens' case, PSRs were not filed in CM/ECF. However, the PSR is accessible to both the FPD and the U.S. Attorney in this case.

Mr. Gravens is currently an inmate at the Federal Correctional Institution in Seagoville, Texas.   (Docket 104 at p. 3).   The parties agree and the BOP Inmate Locator indicates, Mr. Gravens has a scheduled release date of May 17, 2026.   (Dockets 108 at p. 1; 111 at p. 1; and https://www.bop.gov/inmateloc/ (last accessed December 15, 2020).   As of this date, Mr. Gravens has served 49.9 percent of his sentence and under his current status in the BOP, Mr. Gravens' home detention eligibility date is November 17, 2025. (Docket 107 at p. 108).   Mr. Gravens is 61 years old.   (Docket 104-1 at p. 4).

Mr. Gravens' *pro se* motion seeks compassionate release on the basis of extraordinary and compelling reasons in light of his personal health issues during the COVID-19 pandemic.   (Docket 104 at p. 1).   Mr. Gravens suffers from:

- [H]ypertension.   (Docket 106 at p. 5);

- Lung issues consisting of chronic obstructive pulmonary disease ("COPD"), obstructive sleep apnea or polycythemia vera. (Docket 107 at pp. 4, 15, 40, 72, 78, 92 & 98); and

- Hyperlipidemia.   (Docket 106 at p. 5);

Mr. Gravens argues he meets the criteria of U.S.S.G. § 1B1.13, application note 1(A)(ii).   (Docket 108 at p. 14).   That is, he "is 'suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover.' " Id. (citing U.S.S.G. § 1B1.13, note 1(A)(ii)(I)).

4

Addressing the 18 U.S.C. § 3553(a) factors, Mr. Gravens submits he has been "a 'model inmate' with no major violations or infractions, all as exemplary of his rehabilitative initiative."  (Docket 104 at p. 4).  Mr. Gravens asserts "[h]e has established a proven record of compliance within the Bureau of Prisons, and has prepared for a sound and secure release plan that assures a residence, a supportive network of individuals who are prepared to further his rehabilitation, and a formidable plan for financial support and security so that he will not be vulnerable or at risk."  Id. at p. 16.

Mr. Gravens contends "[h]e established a proven history of productivity and employability, he has maintained a sound and productive prison rehabilitative initiative, he has programmed extensively, has remained free from any major or significant violations, and has the promise of a sound and supportive residence and network to assure a successful transition and re-entry."  Id. at p. 17.  Because of his long-term employment as an air traffic controller, Mr. Gravens represents that his retirement benefits will provide him "security and stability into the future."  Id. at p. 5.

"While this court cannot order the BOP to designate Mr. Gravens to serve the remainder of his custodial sentence on home confinement," he argues the court "can reduce his sentence to time served and impose a period of home confinement as a condition of   supervision."  (Docket 108 at p. 15) (referencing 18 U.S.C. § 3582(c)(1)(A); United States v. Sanchez, No. 18cr00140, 2020 WL 1933815, at *6-7 (D. Conn. Apr. 22, 2020); United States

v. Burrill, No. 17-cr-00491, 2020 WL 1846788, at *3 (N.D. Cal. Apr. 10, 2020); United States v. Williams, No. 3:04cr95, 2020 WL 1751545, at *3-5 (N.D. Fla. Apr. 1, 2020).   If the court were to impose electronic monitoring or other conditions upon his release from confinement, Mr. Gravens submits he would comply with the additional conditions.   Id. at p. 16.

Mr. Gravens plans to reside with his wife, Stacey Rogers, who will permit him to live with her until his other home is available.   Id.   Ms. Rogers is willing to pick him up at FCI Seagoville and take him directly to Grapevine so that "he can self-isolate or self-quarantine for any period the court deems necessary."   Id.

For these reasons, Mr. Gravens argues he has shown extraordinary and compelling reasons warranting an "immediate sentence modification for early and immediate release under the 'compassionate release' [provisions of] §§ 3582(c) and 3582(c)(1)(A)(i)."   (Docket 104 at p. 18).

## MR. GRAVENS' CLASSIFICATION

On May 12, 2020, the FPD and the U.S. Attorney filed a notice of categorization of compassionate release motion.   (Docket 105).   They jointly "agree [Mr. Gravens'] case should be categorized as an Intermediate Priority case."   Id.

6

**ANALYSIS**

Section 3582(c) permits the district court to consider a prisoner's request for compassionate relief after he exhausts the administrative remedies mandated by the statute.

> [T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i).

The court finds Mr. Gravens exhausted the administrative procedure provision contemplated by § 3582(c)(1)(A).   On April 22, 2020, Warden K. Zook, denied Mr. Gravens' request for a reduction of sentence or release to home confinement.[4]   (Docket 104-1 at p. 3).   The warden's conclusion was based on the standard for "extraordinary or compelling reasons" delineated in "Program Statement 5050.50, Compassionate Release/Reduction in Sentence:

---

[4]On March 26, 2020, United States Attorney General William Barr issued a memorandum to the Director of Bureau Prisons captioned "Prioritization of Home Confinement As Appropriate In Response to COVID-19 Pandemic." https://www.bop.gov/coronavirus/ (last visited October 22, 2020).   Warden Zook's decision did not mention the memorandum or the option of home confinement.   (Docket 104-1).

7

Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)[.]"   <u>Id.</u>
The factors in Program Statement 5050.50 are the same as those stated in the
United States Sentencing Guidelines ("U.S.S.G."").   <u>Compare</u> Docket 104-1 at
p. 3 and U.S.S.G. § 1B.1.13 cmt.1(A)-(C).   However, the court's consideration
of extraordinary and compelling reasons under 18 U.S.C. § 3582(c)(1)(A)(i) is
not tied to U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) (U.S.S.G. 2018) or the COVID-19
home confinement provisions of the CARES Act, Pub. L. No. 116-136, Section
12003(b)(2).

"Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and
compelling reasons' that might merit compassionate release."   <u>United States v.</u>
<u>McCoy</u>, No. 20-6821, 2020 WL 7050097, at *3 (4th Cir. Dec. 2, 2020).   That
task was left to the United States Sentencing Commission.   "[I]n promulgating
general policy statements regarding the sentencing modification provisions in
section 3582(c)(1)(A) . . . [the Sentencing Commission] shall describe what
should be considered extraordinary and compelling reasons for sentence
reduction, including the criteria to be applied and a list of specific examples."
28 U.S.C. § 994(t).

Prior to the First Step Act, the Sentencing Commission established four
categories for "extraordinary and compelling reasons for sentence reduction,
including the criteria to be applied and a list of specific examples."   28 U.S.C.
§ 994(t).   Those categories generally focus on the defendant's age, medical
condition, family situation and any other reasons the BOP deems to be

8

extraordinary and compelling.   U.S.S.G. § 1B1.13 cmt. n.1.   The four

categories have not been updated since December 2018 when the First Step

Act became law.[5]

The United States Courts of Appeals for the Second, Fourth, Sixth and

Seventh Circuits have addressed the court's authority under the First Step

Act.[6]   See United States v. Brooker, 976 F.3d 228 (2d. Cir. 2020); United

States v. McCoy, 2020 WL 7050097; United States v. Jones, No. 20-3701,

2020 WL 6817488 (6th Cir. Nov. 20, 2020); and United States v. Gunn, Case

No. 20-1959, 2020 WL 6813995 (7th Cir. Nov. 20, 2020).

The Second Circuit identified the question at the heart of these cases,

which is "whether the First Step Act allows courts independently to determine

what reasons, for purposes of compassionate release, are 'extraordinary and

compelling,' or whether that power remains exclusively with the BOP Director

as stated in Application Note 1(D)."   Brooker, 976 F.3d at 234.   The Second

Circuit concluded "that, despite Application Note 1(D), the First Step Act freed

district courts to exercise their discretion in determining what are

extraordinary circumstances."   Id.   The court held the language of U.S.S.G.

_____

[5]The United States Sentencing Commission lacks a quorum and "currently has only two voting members, two shy of the four it needs to amend the [U.S.S.G.]."   United States v. Marks, 455 F. Supp. 3d 17, 24 (W.D.N.Y. 2020) (references omitted).

[6]The United States Court of Appeals for the Eighth Circuit had two clear opportunities to address this issue but declined to do so.   United States v. Rodd, 966 F.3d 740 (8th Cir. July 16, 2020) and United States v. Loggins, Jr., 966 F.3d 891 (8th Cir. July 31, 2020).

§ 1B1.13 "is clearly outdated and cannot be fully applicable."   Id. at 235.

"[T]he First Step Act freed district courts to consider the full slate of

extraordinary and compelling reasons that an imprisoned person might bring

before them in motions for compassionate release.   Neither Application Note

1(D), nor anything else in the now-outdated version of Guideline § 1B1.13,

limits the district court's discretion."   Id. at 237; see also Gunn, 2020 WL

6813995, at *2 (agreeing with the Second Circuit that the Guidelines Manual

"does not curtail a district judge's discretion"); Jones, 2020 WL 6817488, at *9

("In cases where incarcerated persons file motions for compassionate release,

federal judges . . . have full discretion to define 'extraordinary and compelling'

without consulting the policy statement § 1B1.13."); McCoy, 2020 WL

7050097, at *8 ("As of now, there is no Sentencing Commission policy

statement 'applicable' to the defendants' compassionate-release motions, which

means that district courts need not conform, under § 3582(c)(1)(A)'s

consistency requirement, to § 1B1.13 in determining whether there exist

'extraordinary and compelling reasons' for a sentence reduction.").

The court retains its independent authority "to consider the full slate of

extraordinary and compelling reasons that an imprisoned person might bring

before [the court] in motions for compassionate release."   Brooker, 976 F.3d at

237.   See also McCoy, 2020 WL 7050097, at *9 (same); Jones, 2020 WL

6817488, at *9 (same); Gunn, 2020 WL 6813995, at *2 (same).   The purpose of

the First Step Act was to expand the availability of compassionate release

10

based on judicial findings of extraordinary and compelling reasons without being restricted to those categories identified by the Sentencing Commission or the rationale used by the BOP before the passage of the First Step Act.

The government opposes Mr. Gravens' motion.   (Docket 111).   As of June 1, 2020, the government indicates Mr. Gravens has served only 53.3 percent of the original 180-month sentence.   Id. at p. 1.   The government asserts FCI Seagoville, a facility which houses 1,722 inmates and another 138 prison camp inmates has only one COVID-19 case, a staff member.   Id.   "As of June 1, 2020," the government submits "there are no inmates at [FCI Seagoville] . . . diagnosed with COVID-19."   Id. at p. 12 (referencing https://www.bop.gov/coronavirus/) (last accessed June 1, 2020)).

The government contends that "in order to qualify for compassionate release after having exhausted his . . . administrative remedies with the Bureau of Prisons, a defendant must be able to demonstrate one of the listed reasons in [U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)]."   Id. at p. 5.   The government argues the reasons "encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population."   Id. at p. 6.

The government submits "[t]he only health condition possibly covered by the CDC's listed risk factors is [Mr. Gravens'] hypertension."   Id. at p. 7. Regarding defendant's high blood pressure, the government asserts it "is not a significant [COVID-19] risk factor."   Id. at p. 10.   "If the Court were to accept

11

Defendant's logic," the government argues "every middle-aged prisoner with at-risk conditions on the CDC list would be entitled to immediate and permanent release, regardless of the severity of those conditions, where the inmate is located, what the inmate did, the length of time left on his sentence, or what will follow release."   Id. at p. 7.   "That result," according to the government "is inconsistent with the applicable statute and its purpose."   Id.

"[B]ecause Defendant is basing his argument for a sentence reduction on his medical conditions," the government contends "he must show he has met his burden under [U.S.S.G. §1B1.13 cmt n.1(A)(ii)] that he is suffering from a 'serious physical or medical condition' that 'substantially diminished the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover.' "   Id. at p. 9.   The government submits Mr. Gravens cannot and has not met that burden of proof. Id.

The government contends the "BOP is taking extensive efforts to combat the spread of COVID-19."   (Docket 111 at p. 12).   Since April 13, 2020, the government argues the BOP has "implemented Phase Six [of its Action Plan]" which establishes:

> several additional preventive and mitigation measures, including suspension of social visitation, internal inmate movements, legal visits, official staff travel, training, access by volunteers and many contractors; extensive screening of staff and inmates (including screening of all new inmates); quarantine; and modified operations to maximize social distancing as much as practicable.

Id. at p. 13 (referencing Federal Bureau of Prisons, BOP Implementing Modified Operations, available at https://www.bop.gov/coronavirus/covid19_status.jsp) (last accessed May 15, 2020)).   "All the planning by BOP," the government contends, "reinforces that Defendant cannot establish extraordinary or compelling reasons for release because BOP is making continued efforts to work to contain the virus, and reveals the Defendant's argument that he would be safer in another community is flawed." Id. at p. 14.   For these reasons, the government submits Mr. Gravens "has not . . . shown extraordinary and compelling reasons for his release." Id.

Addressing the § 3553(a) factors, the government contends Mr. Gravens' motion should be denied because he "failed to demonstrate that he is not a danger to the safety of the community." Id.   Similarly under the Sentencing Guidelines, the government argues defendant's sentence reduction must be denied unless the court determines he "is not a danger to the safety of any other person or the community." Id. (citing U.S.S.G. § 1B1.13(2)).

The government points out Mr. Gravens was convicted for "attempt[ing] to hire a minor to engage in sexual activity, and a search of his telephone revealed he had multiple conversations regarding attempted sexual encounters with underage females." Id. at p. 15 (referencing PSR ¶¶ 27-31).   The government submits that a member of the defendant's family "expressed concern that [Mr. Gravens] is a pedophile and predator." Id. (referencing PSR ¶ 39).   The government reminds the court Mr. Gravens' offense carried a 15-

13

year mandatory minimum sentence, a sentence imposed by the court.   Id.
Because Mr. Gravens "has only served approximately 53.5% of his sentence[,]"
the government argues reducing the sentence "would not be a deterrent and
would create a disparity in sentencing as compared to other similarly situated
individuals."   Id.

"If the Court is inclined to grant Defendant's motion for compassionate
release," the government asserts the "Court should substitute a term of
probation or supervised release with a condition of home confinement for the
duration of Defendant's current sentence of imprisonment."   Id. at p. 16.   "In
order to minimize risks to public health," the government submits the release
order should "(1) . . . provide release only after Defendant's release and travel
plans are in place, and (2) . . . set any release 14 days from the date of its order
to accommodate BOP's ability to quarantine Defendant prior to his release to
protect the community from potential further spread [of COVID-19]."   Id.

In his reply brief, Mr. Gravens argues it is undisputed he suffers from
hypertension.   (Docket 113 at p. 1).   He submits "[h]ypertension is
consistently associated with severe or critical illness, and with death."   Id.
(citing *The importance of hypertension as a risk factor for severe illness and
mortality in COVID-19*, Anesthesia (Apr. 27, 2020), available at https://
onlinelibrary.wiley.com/doi/10.1111/anae.15103).   Relying on the Anesthesia
article, Mr. Gravens contends that "[b]ased on the current evidence,
hypertension should be considered as a significant risk factor for poor

14

outcomes amongst those presenting to hospital with COVID-19." <u>Id.</u> at p. 2 (citing *The importance of hypertension as a risk factor for severe illness and mortality in COVID-19*, Anesthesia (Apr. 27, 2020)).   He argues "the most recent data from the CDC shows that 57.9 percent of hospitalized patients had hypertension.   This category includes all individuals with 'a medical diagnosis of hypertension,' not just those whose condition is not well-controlled." <u>Id.</u> (referencing and citing *COVID-19 Laboratory-Confirmed Hospitalizations – Preliminary data as of May 23, 2020*, CDC COVID-NET, available at <u>https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html</u>) (last accessed June 5, 2020).

Mr. Gravens asserts the government's argument, that he may have had "a historical heart attack" to support the "[a]bnormal ECG," is "concerning in the context of COVID-19." <u>Id.</u>   Using the BOP records, Mr. Gravens submits "[t]here is no indication of any . . . follow up on [the abnormal ECG]." <u>Id.</u>

Addressing the government's minimization of his lung issues, Mr. Gravens points to the CDC's report.   "In the CDC's actual tracking of underlying health conditions, it considers chronic lung disease to include 'chronic obstructive pulmonary disease, bronchiolitis obliterans, cystic fibrosis, interstitial lung disease and obstructive sleep apnea.' " <u>Id.</u> at p. 3 (citing *COVID-19 Laboratory-Confirmed Hospitalizations – Preliminary data as of May 23, 2020*, CDC COVID-NET).   Mr. Gravens reminds the court:

> The government does not dispute that [he] has a history of lung issues – exposure to asbestos, calcified nodules in his left lung, evidence of old granulomatous disease, and pleural thickening.

15

> The government also does not dispute that a sleep study to determine whether [he] has sleep apnea has been pending for years.

Id.

Mr. Gravens points out "that in December 2018, the BOP entered a diagnosis of polycythemia vera . . . [And] [t]his diagnosis was not removed until May 11, 2020, after [defendant] filed his pro se motion, and apparently without an examination or additional testing." Id. (referencing Docket 107 at p. 99). He contends "[t]he physician who conducted a chart review to remove the diagnosis of polycythemia vera wrote that a more likely cause of Mr. Gravens' consistent high hemoglobin levels 'would include obstructive sleep apnea and COPD.'" Id. (citing Docket 107 at p. 99). Mr. Gravens asserts "the BOP has not followed up on either possibility." Id. Mr. Gravens submits "there are several indications that the BOP is not providing adequate medical care to diagnose and treat [his] health conditions." Id. Mr. Gravens argues "[c]ompassionate release requests require individualized considerations. [His] individual circumstances warrant relief. He is 61 years old, he has hypertension, a history of lung issues, and a number of other conditions, and he is incarcerated in a low security facility surrounded by hundreds of inmates." Id. at p. 4.

Mr. Gravens asserts the BOP is not testing the inmate population at FCI Seagoville for COVID-19. Id. at p. 6. "*Zero confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases." Id. (citing United States v. Amarrah, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) (italics in

16

original)).   Based on the empirical data included in his reply brief, Mr. Gravens argues "[t]he experience in other BOP facilities shows that if and when COVID-19 enters FCI Seagoville, it will spread fast.   The fact that there are no confirmed cases among inmates is not a reason to deny relief.   On the contrary, that fact makes now the ideal time to act, before the virus spreads like wildfire through the facility."   Id.

Mr. Gravens contends the government's claim "it is mere 'speculation' that [he] will be safer living in a single family home in Grapevine, Texas[,] . . . ignores the realities of prison life in a low security facility."   Id. at p. 5.   Mr. Gravens submits he "will be safer self-isolating and social distancing at home, even where there are case[s] in the community."   Id. at p. 6.   Because he had no criminal history, no disciplinary violations during his seven years of incarceration and will be subject to life-time supervised release, Mr. Gravens argues he "is not a danger to the community."   Id. at p. 8.   For all these reasons, he "requests an order reducing his sentence to time served under 18 U.S.C. § 3582(c)(1)(A)."   Id.

FCI Seagoville currently has 19 COVID-19 positive inmates and one positive staff member.   See https://www.bop.gov/coronavirus/ (last visited December 14, 2020).   With a population of 1,647 inmates, Seagoville has had 1,273 inmates test positive and four inmates have died from COVID-19.   Id.

According to the BOP Health Services' records, Mr. Gravens has suffered from hypertension since August 31, 2017, and hyperlipidemia.   (Docket 106 at p. 5).   For hypertension, Mr. Gravens takes 25 mg of hydrochlorothiazide and

17

10 mg of Lisinopril[7] daily.    (Docket 107 at p. 3).    For hyperlipidemia, he takes

20 mg of Pravastatin daily.    Id.    Gravens' records indicate he is compliant

with taking the medications.    Id. at p. 12.

BOP records indicate Mr. Gravens suffers from polycythemia vera,[8]

COPD[9] or obstructive sleep apnea.[10]    (Docket 107 at pp. 2-3, 12-4, 40,

98 & 99).    During a clinical examination in October 2018, physician A.[11]

charted Mr. Gravens suffered from polycythemia vera.    (Docket 107 at pp. 12-

---

[7]Lisinopril is an angiotensin-converting enzyme (ACE) inhibitor used to lower high blood pressure to prevent heart attacks and strokes.    https://www.webmd. com/drugs/2/drug-6873-9371/lisinopril-oral/lisinopril-oral/details (last visited November 19, 2020).

[8]"Polycythemia vera . . . is a type of blood cancer.    It causes . . . bone marrow to make too many red blood cells.    These excess cells thickens [the] blood, slowing its flow, which may cause serious problems, such as blood clots."    https://www.mayoclinic.org/diseases-conditions/polycythemia-vera/symptoms-causes/syc-20355850 (last accessed November 19, 2020).

[9]"Chronic obstructive pulmonary disease (COPD) is a chronic inflammatory lung disease that causes obstructed airflow from the lungs. Symptoms include breathing difficulty, cough, mucus (sputum) production and wheezing.    It's typically caused by long-term exposure to irritating gases or particulate matter, most often from cigarette smoke.    People with COPD are at increased risk of developing heart disease, lung cancer and a variety of other conditions."    https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679 (last accessed November 19, 2020).

[10]"Obstructive sleep apnea . . . occurs when [the] throat muscles intermittently relax and block [the] airway during sleep. . . . Signs and symptoms of obstructive sleep apnea include . . . excessive daytime sleepiness . . . loud snoring . . . morning headaches . . . difficulty concentrating during the day. . . mood changes . . . high blood pressure . . . ."    https://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/symptoms-causes/syc-20352090 (some capitalization omitted) (last accessed November 19, 2020).

[11]The court chooses not to identify the BOP personnel by name.

14 & 92).   Yet in May 2020, while conducting a chart review, physician B. recorded that the "diagnosis of polycythemia vera was applied before a complete evaluation. . . . Other more likely causes of high hemoglobin would include obstructive sleep apnea and COPD.   This diagnosis of polycythemia vera should therefore be removed from record while patient undergoes evaluation for the more likely causes of high hemoglobin."   Id. at p. 99.

In August 2019, x-rays disclosed "calcified nodules measuring up to 3 mm in the left upper to mid lung.   Lungs and pleural spaces are otherwise clear."   Id. at p. 78.   A chest CT in October 2019 disclosed "[m]ild sequela of old granulomatous disease in the chest as described with a small nodular radiographic associated with the right minor intralobar fissure, most likely compatible with pleural thickening."[12]   Id. at p. 72.

It must be noted physician B. conducted an examination of Mr. Gravens in December 2019, but did not review the 2018 records or advocate for a sleep study during the 2019 examination.   The same physician charted in December 2019 that Mr. Gravens had a "[h]istory of exposure to asbestos."   Id. at p. 4.

---

[12]"Pleural thickening is an asbestos-related disease that can occur as a result of exposure to asbestos over an extended period of time. . . . Pleural thickening refers to a thickening of the lining of the lungs, the pleura, which is a thin layer of membrane that covers the inside of the rib-cage as well as the outside of the lungs. . . . When the lungs become calcified or scarred as a result of pleural thickening, the elasticity of the pleural membrane is reduced, which can result in impairment of lung function."   https://www.nationalasbestos.co.uk/news/what-are-the-symptoms-of-pleural-thickening/ (last accessed November 19, 2020).

The BOP records note sleep apnea testing has been deferred for Mr. Gravens for nearly two years.  Id. at pp. 2-3, 12 & 14.

An ECG performed on October 24, 2019, while Mr. Gravens was at FCI Big Spring reflected an "[a]bnormal ECG" and a "[p]ossible inferior infarct-age undetermined."  (Docket 111 at p. 2).  The report reflects a wrong date of birth, but a proper inmate registration number.[13]  Id.  There is no indication in Mr. Gravens' BOP records of any follow-up or additional investigation into the source or cause for the abnormal ECG.

The court finds Mr. Gravens met his burden of proof and presented "extraordinary and compelling reasons" warranting a sentence reduction under § 3582(c)(1)(A)(i).  The CDC identifies COPD as a chronic lung disease which may put people at a "higher risk of severe illness from COVID-19."  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#chronic-lung-disease (last accessed December 14, 2020).  The CDC is concerned that "COVID-19 might cause flareups of chronic lung diseases leading to severe illness."  Id.  Additionally, the CDC warns an adult like Mr. Gravens "might be at an increased risk of severe illness" because of his "Hypertension or high blood pressure."  Id. (bold omitted).  Against these

---

[13]The government contends the record makes "a reference to age 54, which would have been approximately 7 years ago."  (Docket 111 at p. 2).  This contention is without merit as the record clearly references a birth date which would make the patient 54 years old, not that the record was created 7 years ago.

findings, the court must consider if compassionate release comports with the § 3553(a) factors.

In Mr. Gravens' case, the "nature and circumstances of the offense"—commercial sex trafficking—is serious.   18 U.S.C. § 3553(a)(1).   "[T]he history and characteristics of the defendant," requires the court to consider the defendant as a whole person.   Koon v. United States, 518 U.S. 81, 113 (1996). This is Mr. Gravens' first conviction.   See PSR ¶¶ 33-35.   Prior to this conviction, Mr. Gravens was a law-abiding, fully employed member of society. Id. ¶¶ 33-35 & 50-51.   Mr. Gravens completed a significant number of education programs while in the BOP.   (Docket 104-1 at p. 7).   According to BOP records, Mr. Gravens has no disciplinary writeups.   (Docket 106 at p. 15). The court finds Mr. Gravens conducted himself in a positive and productive manner during his seven years in BOP custody.

Setting aside consideration of the fifteen-year mandatory minimum sentence, Mr. Gravens' guideline range would have been 135 to 168 months. (PSR ¶ 58).   Contrary to the government's argument, the court was not permitted to consider the § 3553(a) factors for a sentence below the mandatory minimum sentence.   In the court's view the Sentencing Guidelines, without consideration of the mandatory minimum sentence, would have "reflect[ed] the seriousness of the offense, . . . promote[d] respect for the law, and . . . provide[d] just punishment for the offense . . . [and would have] afford[ed] adequate deterrence to [future] criminal conduct" by the defendant.   18 U.S.C.

21

§§ 3553(a)(2)(A) & (B).   Considering the length of the defendant's time in prison and his behavior while incarcerated, as well as the supervised release special conditions imposed at sentencing, additional incarceration is not necessary "to protect the public from further crimes of the defendant."   Id. § 3553(a)(2)(C). Mr. Gravens' obligation to participate in sex-offender therapy and to comply with the terms of supervised release would best "provide the defendant with . . . correctional treatment in the most effective manner."   Id. § 3553(a)(2)(D).

Incarceration is not the only "kind[] of sentence[] available."   Id. § 3553(a)(3).   A noncustodial sentence will limit Mr. Gravens' liberty interests through supervised release and he will face harsh consequences if he violates the special conditions activated upon his release from BOP custody.   United States v. Gall, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005), rev'd, 446 F.3d 884 (8th Cir. 2006), rev'd, 552 U.S. 38 (2007).   Those special conditions promote respect for the law, protect the public and do not constitute any approval of Mr. Gravens' criminal conduct.   Id.

The criminal statute mandated a mandatory minimum sentence, but this is just one factor for the court to consider at this point.   18 U.S.C. § 3553(a)(4).   At this juncture, use of the First Step Act and the CARES Act will not create "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   Id.

22

§ 3553(a)(6).   The COVID-19 pandemic mandates that every court consider whether the specific characteristics of a defendant warrant compassionate release, regardless of the offense of conviction.

The court finds Mr. Gravens will not pose a danger to the public and that compassionate release is appropriate.[14]   The court retains the authority to reduce Mr. Gravens' sentence to time served.   Following his release from custody, Mr. Gravens will remain on supervised release for life, subject to the mandatory and standard conditions and the special conditions of supervised release imposed in the original sentence.   (Docket 82 at pp. 3-4).

Arrangements are in place to transfer supervision to the Ft. Worth Division of the Northern District of Texas, United States District Court in Ft. Worth, Texas, so Mr. Gravens can commence his period of supervised release in that district.

## ORDER

Good cause having been proven, it is

ORDERED that defendant's motion for compassionate release (Docket 104) is granted.

---

[14]Mr. Gravens' conduct was far different from the danger to the public concerns used by the Federal Court in North Dakota to deny compassionate release.   See United States v. McCloud, No. 2:08-cr-00022, 2020 WL 3066618, at *7 (D.N.D. June 9, 2020).   The aggravated sexual abuse of a minor was "ongoing" with "multiple occurrences of sexual contact with a young, vulnerable victim."   Id., 2020 WL 3066618, at *7.

23

IT IS FURTHER ORDERD that the defendant's sentence of imprisonment is reduced to time served.

IT IS FURTHER ORDERED that upon his release, Mr. Gravens shall initially reside at his wife's new address, 4262 Hearth Side Drive, Grapevine, Texas.

IT IS FURTHER ORDERED that within 72 hours of release from the custody of the BOP, Mr. Gravens must report, by telephone, 817-978-3633, to the United States Probation and Pretrial Services Office for the Ft. Worth Division of the Northern District of Texas, United States District Court.

IT IS FURTHER ORDERED that Mr. Gravens shall remain on supervised release for life, subject to the terms of supervised release, the mandatory and standard conditions of supervision and the special conditions of supervision imposed in the original sentence of September 22, 2014.   (Docket 82 at pp. 3-4).

IT IS FURTHER ORDERED that the United States Probation Office shall prepare an amended judgment consistent with this order.

IT IS FURTHER ORDERED that the Clerk of Court shall deliver a copy of this order to the United States Probation Office and the United States Marshals Service.

Dated December 16, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

24